The next case is number 2010, 50-15, Brinskele v. United States. Mr. Taggart. Good morning, Your Honor. I please the Court. I will try to be very brief, because I know that— You have 15 minutes, so use it as you wish. And I struggled with what to say to you this morning, because this case, as you know, spans now 20-plus years and involves a lot of facts and a lot of issues, and it has a number of unique aspects to it. I'm going to focus solely on the aspect of it that I think is truly unique about this case, and I think it is the basis for establishing the decision the Court below was wrong. As you're aware, there are 11 quarters involved in this case, 1992 through the third quarter of 1994, in which a corporation, originally a telecommunications company, became MTC. And during this period of time, it, in its corporate mind, did not act as a purveyor of telephone services. It started out as a management company, and during this period of time, basically, it electronically managed the telephone services for commercial customers, primarily. And in the corporate mind of MTC, it did not collect the telephone excise tax. In the corporate mind... What does that argument relate to? Willfulness? Ultimately, to willfulness. And if we want to skip over that, MTC was collecting revenue. Because the Court decided, as a matter of fact, that it was collecting the money and... It was collecting money, and it was... And so your standard is to show that that was clearly erroneous, a high standard. I understand that, Your Honor, but that's why this case is unique. In every other 6672 case, there is no dispute about the underlying tax liability. In this case, Mr. Brinskelly was found to have willfully failed to pay over a collected tax under 6672. The flaw in that analysis is that MTC, during the 11 quarters in issue, in its corporate mind, collected local revenue for local telephone service, for long-distance telephone service. It collected a fee for managing, and it collected state and local taxes and fees as part of the bills that were paid to its customer. In the last quarter of 1994, it acknowledged that it should start reporting as a purveyor of telephone services, and changed its practices. And, as you know, in 1996, the company was taken over. In 1997, Mr. Brinskelly terminated his relationship with MTC. In 1999, the Internal Revenue Service, for the first time, took the position, which MTC had never taken up until the issue being raised by the Internal Revenue Service. The Internal Revenue Service raised, for the first time, that the monies which had been collected by MTC during this period of time were, in fact, telephone excise tax, which were held in trust as a trust fund penalty liability, and the company was obligated to pay them over to the government. It did not do so, and, therefore, Mr. Brinskelly, as the responsible officer, ultimately, of the company, the president of the company that operated it, was personally liable for this tax liability because he willfully failed to pay over a collected tax. I think the flaw in that analysis is that, until 1999, it was never even asserted that that was a collected tax. MTC treated it all as revenue. It treated itself as a user of telephone services, and it paid the federal excise tax on long-distance telephone services to the actual providers of the services based on the rates at which the telephone companies were charging MTC, and it, of course, was charging a different rate for its customers. The focus of this was that it was charged to the customer and designated a tax, whether or not the tax actually had to be collected and paid over. Is that the reason for the position that this was a collected in trust and, therefore, an obligation to pay to the service? Are you asking, is that the government's position? Yes. Yes, it is. Throughout their trial, and throughout the brief, is that this was a collected tax. I think that the proper analysis is that it may have, should have been, perhaps, treated by MTC, the company. It was wrong. If it was erroneous in its treatment of not treating it as a collected tax, but rather treating it as revenue, that was an error on the part of MTC, and that's why I think that it is important that that error it not be attributed some five years later to the president for willfully failing to pay over a collected tax. It wasn't decided until, it wasn't asserted until five years later. It wasn't, I guess, when it was assessed pursuant to 6672 in 2001, it was then asserted that he had willfully failed to pay over that. When was it determined in California that this was an excise tax? I'm sorry? When was it determined in California that he was a provider? That determination, the final decision of the California PUC, came down in 1995. It was asserted by the California PUC. So he had plenty of notice? Well, there's no question that he was aware of this dispute, because it started in 1992 with the California Public Utilities Commission, because it has a similar set of taxes and charges that it imposed. MTC sent a bill to its customer that said, this is how much you're being charged for local television service. There's an 8% charge for state charges. This is how much is in there for long distance. There's a 3% charge for long distance service. That is part of the bill that the customer got. But MTC did not treat that as a collection of the tax. It was the reimbursement of the taxes and charges that they were going to pay. 8% approximately covered the state. 3% approximately covered the federal. So you're saying that their state of mind absolves him of responsibility? No. I'm saying only that the state of mind of the company in operating that way negates the willful aspect of the 6672 penalty. Not that MTC was doing it correctly, but MTC was not treating it as a collected tax. And the fact that at some later date, the first time in 1999, the Internal Revenue Service asserts that it was acting erroneously and that was a collected tax. Doesn't make MTC's correct, correct in what it had done, but it does negate the willful aspect of the imposition, the assertion and the same tax liability under 6672 against the then president of the corporation. It doesn't mean that MTC did anything right. It's just that the willfulness has to apply either to the collection of the tax, failure to collect the tax, or the failure to pay over a collected tax. And in 1999, when that decision was made, at the time the tax was being collected, MTC didn't treat it as a tax. And therefore, five years later, it is improper to treat Ed Brinskelly as having failed to pay over a collected tax, willfully failed to pay over a collected tax because his corporation, which he owned 60-some percent of, was doing it wrong in those 11 quarters. Just, I don't know if the record reflects this or not, but how large a corporation of MTC, how many employees, any indication? MTC revenues, my recollection is in 1994, just before it was sold, was about $20 million. And any idea of how many employees? I have my, we discussed that at trial, 50, maybe? 50, all right. All right, let's save the rest of your time for a minute, and then we'll hear from the government. Ms. Dilsow. Good morning. Please, the court. Under this court's opinion in Godfrey, reckless disregard of an obligation to pay the tax is enough to establish willfulness. And I think the court of federal claims certainly was correct in holding that Mr. Brinskelly's conduct here at least met that standard. If not, I mean, this is really a situation where any reasonable person would have known they were obligated to pay the tax. The evidence clearly established that MTC was collecting federal excise tax on the entire amount it billed its customers. That's what it denominated as in the bill, and the court of federal claims found that it was collecting tax on its markup. So it was a reseller, so it would purchase from a large carrier like MCI or AT&T for a set amount. Say, just to take a hypothetical, simple hypothetical, say they want $100 worth of service from the large carrier, then they would pay tax on that to the carrier, but they might resell to their customer for $110. And then what they were doing is charging tax on the whole thing. And this was borne out not only by the testimony of the investigating revenue agent, who did extensive work putting together the bills and the documentation of what MTC charges customers. But its own employees testified that this was the case. Carl Hildebrandt, who is one of its managers, testified that the billing system that Mr. Brinskelly designed was one that collected tax on the markup. And Mr. McCord and Mr. Yeager both concluded and repeatedly admonished Mr. Brinskelly of the problem that the company was collecting tax that it wasn't remitting over to the authorities, including the federal government. And their outside accountants, John Caldwell of Arthur Anderson and Ms. Wheatman, formerly Beth Hewson Davis at the time she wrote her reports, of Vicente and Brinker, both found that the company was collecting federal excise tax that it wasn't remitting over to the authorities. And Arthur Anderson commented on it and is questioning its legality. And Ms. Wheatman specifically wrote in a memo that she wrote that MTC has been collecting federal excise taxes and not remitting them to the government. So they- What dates were those two events, the Arthur Anderson and the memo? I believe the Arthur Anderson report was around 1993, and then Ms. Wheatman was preparing certified audits for 1984, so probably that would have been early 1995. And she determined that there was an outstanding accrued liability for federal excise taxes in her certified audit, which is in the record. As her memo is Exhibit 53 and her report is Exhibit 54, and it's all cited at page 18 of the appendix, which is the court's opinion. But you've been talking about the company and its auditors and its outside accountants and its employees. So let me ask you a fundamental question about tax collection. That as far as the IRS is concerned, the corporate structure doesn't exist? It goes directly to, let's say, the internal employee or accountant or president or whatever? Or do we have to have a structure here of deliberately piercing the corporate veil? I didn't see that in the analysis. The way the tax code is set up, it's not necessary to have a piercing of the corporate veil. Under Section 7501 of the Internal Revenue Code, there's an obligation on the entity that's required to collect tax, which was the telecommunications carrier here under Section 4291. So any internal employee who does whatever it is that was done wrong, as far as the IRS is concerned, is then personally liable for the difference? Not just any employee, Your Honor. Under Section 6672, there's protection for the government that imposes on any responsible person with respect to the entity required to pay tax. If that person willfully fails to cause the corporation to carry out its duty to collect taxes and once they're collected, to remit them over to the government, and that statute is very explicit. There are many, many cases cited in our briefs that indicate that then that waiver of the tax arises when it's collected. That's clear from the Goldston and Jones cases that are cited in our briefs. And once that obligation arises, then any person who is a responsible person with respect to the corporation, which basically means someone who has the power to cause the taxes to be paid. And here, under the case law, Mr. Brinskelly clearly fit that description. He was the chairman, the CEO, the president. He had, the lower court's opinion goes on at length about all the evidence that he had the power to write checks. And his own employees testified that basically nothing happened to the company without his say so. So he clearly had the power to do that, and under the case law, he's liable under this- Okay, so the government's position then is that because it was charged to the customer and it didn't have to be paid. Well, I think, Your Honor, that the conclusion, the suggestion that it turned out eventually that it didn't have to be paid is not quite correct. What happened was, at the time this tax was being billed and collected, it was presumed by everybody involved that the telephone, the long-since telephone tax applied to all loneliness- That's exactly my question. If it turned out that that impression was incorrect, nonetheless, we have a matter of culpability, lawfulness for not acting otherwise. Well, I think at the time that it was collected, it was understood that it was owed. And as the Brennan and the Kalki and the Sigmund cases that are cited in our briefs, which deal with an airline excess tax that had actually been repealed but was collected, explain, in that situation, the collection agent still has an obligation to pay the tax over to the government, and the recourse of the taxpayer, who's ultimately liable, is to claim a refund from the government. And that if there were any other, and that the collection agent, just like an agent of the government, just like an IRS employee would be in that context. And the collection agent, I think the Court of Federal Claims correctly concluded, is never allowed to keep the tax. And so- Your point, I take it, is that it either belonged to the government or to the taxpayer, but the one person it didn't belong to was MTC. That is correct, Your Honor. And they ended up with the money. Yes, but I would point out that I don't think this is a clear-cut case of it didn't belong to the government, because what ultimately happened with the Long Distance Telephone Tax is that in 2000, is there was a change in the early 90s, about the time of this case, from the traditional method of billing, which was based on distance and time combined, to by the 2000s, billing being based on time only. And in 2004, 10 years after the last year at issue here, litigation arose where it was determined that the statutory language shouldn't be construed as extending a time-based cost. Judge Newman surfaces a kind of unfairness to it, to what happened. Right, but what I'm saying- But your point is that at the time, within the terms of the statute, he was required to collect. And that's what the statute required. He was required to collect, and he was required to pay it over to the government. And he clearly knew that he was required to. He was admonished by his accountants and his employees in that regard. And he knew enough that by 1994, he started making sure that the company did pay the tax. And the fact that it did start paying the tax indicates he clearly knew it should, yet he didn't go back and pay the earlier tax. And the case law cited in our brief that explains that where a responsible person, even after the period is in question, comes to realize they should have paid the tax, that they're liable if they don't go back and make sure earlier periods were paid. And instead, he went and continued to draw salary and money out of the company, and to pay other creditors, and to get infusions of capital, none of which went to pay the tax for those earlier periods. So remind me, how much of what's being assessed was penalties, interest? Well, Your Honor, I think the way this works is it's a 100% penalty that reflects the amount of the tax. And the goal is for the government to just collect the tax that was actually owed. And so that's... Well, what's assessed is not the tax. I'm not sure. Can you give me an order of magnitude?  Just some round figures, if you have them. Yeah, I think the total amount of the assessment was $959,000. And then there would be interest on that assessed amount until it's paid. And how much of that was penalty? It's called in the statute a penalty tax. So it's called a 100% penalty, but that amount is what MTC should have paid to the government. There's no penalty in that figure? Well, as I said, it's called a penalty tax, but it's basically designed to let the government... Just so I understand a simple answer, how much of that was the tax that was denominated tax collected from the customer and for these 11 quarters not paid to the service? The entirety of that assessment would be the amount that should have been paid over, I believe. That wasn't my question. You're adding 100%. No, I'm not adding 100%. I'm saying that is the amount. That's the entire amount of tax that should be paid. They call it a penalty, as I understand it, but it's not a penalty in a conventional sense. It's just the amount. It's not a traditional penalty like an extra amount tacked on. In other words, there are two things, the tax and then a penalty equal to the unpaid tax. No, there's only one time the tax. When you say 100% penalty, that sounds like 100% on top of the assessment. You're saying that no, there's effectively 0%. I don't understand where the willfulness comes in. Well, the statute under Section 6672 expressly allows the government to collect whatever tax the corporation should have paid over to the government that is collected from its customers. If from a person who was number one responsible, which I discussed a few minutes ago, Mr. Brinsky satisfies, and secondly from a person who is willful. The case law basically describes that as someone who either had knowledge or recklessly disregarded their obligation to pay the tax over to the government. Here, where the information has been imparted to Mr. Brinsky, the records were complete with examples of where he was told he should be paying the tax. So the corporation didn't pay. That's correct. He is being assessed for the unpaid tax plus interest. Plus interest from the time of the assessment. Period. Yes, Your Honor. So is interest included in that sum you gave? I think that sum includes interest up to 1999, but then ultimately the judgment I think would include interest and there was a calculated interest after that point. You don't have the breakdown? I don't have that period in front of me. You're defending the assessment? I'm sorry. Yes, Your Honor, the assessment is correct, and then the interest is just a matter of computation with passage of time. And I think the assessment is ultimately based on the amount of tax that was collected. I'm asking, all I want to know is how much of that round figure of a million dollars was the amount of tax that was collected and not paid over and how much of it has been added on? I believe the $959 figure is the amount of tax. No interest? Let's see. Yeah, because that's the assessment. Yeah, on page 47 of the appendix I have it. And it actually lists each quarter the excise tax that had been collected and the total is $959,244. Okay, so there's no interest and no penalty in that figure? That's correct, Your Honor. And there's no penalty in any event? No. As Judge Bryson was aptly explaining, it is simply under the terms of statute denominated a penalty, but it is actually allowing the government to just retrieve the tax that had been collected on its behalf that was held by the company. Does that answer your question? Yes. Yes. But this is exactly the amount which was identified as tax, collected, and not paid over. Yes, that's correct. And as I said, that's on page 49 of the appendix where it's detailed in the complainant's self about what the assessments were. Okay. And it details it for each quarter. So the issue of willfulness which has been raised is in order to avoid the corporate structure and go directly to a responsible person? Yes, that's correct, Your Honor. MTC as a corporation was bought out by a company called NetSource in 1997 and then eventually intervened. Is that relevant? Is that relevant? Well, I'm simply pointing out that's what happened to the corporation and that, you know, at least, you know, that's why the entirety of the penalty is being, or the entirety of the tax is being sought from Mr. Grinscally because he, until 1997, was the responsible person with respect to the government and he acted willfully because he knew, under the case law, where one knows that the tax should have been paid, as he clearly did because he started at the end of 1984 making sure it did get paid over. And his employees, his accountants, were telling him and he acknowledged himself he was involved in a constant dialogue about this tax issue, about tax issues. And so there's a situation where he certainly was informed by Mr. McCord, by Mr. Yeager, by Ms. Wheatman, by Mr. Caldwell. But I don't understand. If there was a liability in the first instance, it was a liability of the corporation, and the corporation was sold, why wasn't that liability acquired by the acquiring corporation? Well, what happens under Section 6672 is this statute and it's detailed in this Court's opinion in Godfrey, which is the Vice President of this Court, explains the statute and how it operates to basically attach an obligation based on the breach of the duty to pay over the tax on the responsible person of the corporation who willfully failed in their duty. So the person who could see to it that the tax was paid remains liable, and even if that person loses control of the corporation, as the Jones case, which is cited in our brief, demonstrates, that person remains liable under Section 6672. And there's very clear and voluminous precedent on this issue that's cited in our brief. So does the IRS have two places to go to the acquirer of the company who succeeded to its liabilities and to the responsible party here? Potentially it would. In this case, as I mentioned, the corporation had gone into bankruptcy and so I think there are not any assets to go to. When you say the corporation, you mean the acquiring corporation? The successor. The successor corporation went into bankruptcy. And it's just a matter of practice. The tax only gets collected once. If there were two responsible persons within a corporation or some money were gotten from the successor corporation, the IRS just seeks enough to make it whole. And the case law reflects that the Section 6672 penalty is just enough to make the IRS whole and basically recover what was collected as an agent for the government and not paid over to the government. Any more questions? Thank you, Ms. Johnson. Mr. Taggart. Thank you. Let me go back to the questions you've been asking on 6672. 6672 is a device pursuant to which the Internal Revenue Service can collect a tax. It's not a penalty, but it's referred to as a 100% penalty because the Internal Revenue Service is collecting a tax in basically one of three situations, only two of which are really relevant here. And that is where a corporate entity or someone one taxpayer that's controlled or influenced by another taxpayer has failed to collect a tax. Or where in this case the corporation has collected a tax but has failed to pay it over to the United States. That's a situation we have here based on the way the tax were reconstructed later on. MTC paid a substantial amount of telephone excise tax throughout this period of time. This tax liability that's an issue in this case is on the difference between what it was paying the carriers that provided the service and what the MTC was charging its customers. And so approximately and my numbers were wrong earlier probably more like 40 million dollars in gross revenue in the last year and it had a markup MTC did of differential on long distance of about 25%. So it was paying 3% to its carriers on 75% of its gross revenue and it grew very rapidly so 94 is a much larger year. But the million dollars approximately that was assessed in 1999 against the company and then in 2001 asserted as a penalty against Mr. Grinskelly was the tax that was attributable to the differential between what customers were paying and what was being paid upstream. That works against you with respect to willfulness doesn't it? Because if the company was paying on the services for which it was buying that which it was reselling at a higher price it didn't pay on. I don't think so at all because the issue in that period of time was not whether the tax had to be paid the issue was what kind of entity MTC was for reporting purposes. Well if it buys a service for $100 and resells it at $120 what else is the service that's being sold for $120? I mean it knew that the tax was being paid on the $100 purchase. But MTC wasn't selling the service MTC was selling the service of managing your telephone service It would come to you and say you're paying $1000 a month in long distance services sign up with us we will reprogram your phones and we will get you a 65% rate on that and then it would buy the services at a 75% and it would buy those services for $0.65 on the dollar and would route them through the carriers and it billed its customers for telephones local service long distance services for its management service all wrapped up in one bill not separately identified and for its reimbursement of the local taxes and charges that it was going to pay on those services and the long distance tax and services that it was going to pay and it treated itself as a user and paid upstream. This is why the willfulness perhaps in flaunting the California Public Utilities Commission and operating as a electronic reseller. And also what his own accountants said, isn't that right? When I was described when they came in later on they all just point down the line to Edman Skelly as the last person standing all of that was simply for them to avoid their own liability. Please finish the thought. The reports, I point to one thing that came up in this when they switched the 1995 Consetti and Brinker audited financial statement they were concerned that the Internal Revenue Service might come back and say for prior quarters you have an additional federal excise statute. There was a half a million dollar reserve set up in the financial statement in the 1995 audited financial statement because of the switch over. The willfulness didn't exist except in flaunting the way MTC was operating because of the battle with the California Public Utilities Commission had nothing to do with the willfulness on 6672 because MTC openly and notoriously was treating itself as a user and paying the tax upstream at all the time that these quarters in issue evolved into a much different thing after Mr. Prince-Kelly was eliminated from the corporation. Thank you. Okay. Thank you Mr. Tackett. Mr. O'Sullivan, case is taken under submission.